# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

STEVEN R. HOWARD, JR.,          )
                                )
Plaintiff,                      )
                                )
vs.                             )
                                ) NO. 3:13-CV-95
CAROLYN W. COLVIN,              )
Acting Commissioner of          )
Social Security,                )
                                )
Defendant.                      )

## OPINION AND ORDER

This matter is before the Court for review of the Commissioner of Social Security's decision denying Disability Insurance Benefits and Supplemental Security Income to Plaintiff Steven R. Howard, Jr.  For the reasons set forth below, the decision of the Commissioner is **REVERSED** and this case is **REMANDED** to the Social Security Administration for further proceedings consistent with this opinion pursuant to sentence four of 42 U.S.C. section 405(g).


BACKGROUND

In March of 2010, Steven R. Howard, Jr. ("Howard"), filed an application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. section 401 *et seq.,* and Supplemental Security Income ("SSI") under

Title XVI of the Social Security Act, 42 U.S.C. section 1381, *et. seq.* Howard alleged that his disability began on February 1, 2010. The Social Security Administration ("SSA") denied his initial applications and also denied his claims upon reconsideration.

Howard requested a hearing, and on August 4, 2011, Howard appeared with his attorney at an administration hearing before Administrative Law Judge ("ALJ") Melody Paige. Testimony was provided by Howard, the claimant's wife, Rhianna Howard ("Rhianna"), and vocational expert ("VE") Thomas A. Gusloff. On September 15, 2011, the ALJ issued a decision denying Howards's claim, finding him not disabled because he could perform his past relevant work as a wire harness assembler and buffing machine operator. (Tr. 29.)

Howard requested that the Appeals Council review the ALJ's decision, but that request was denied. Accordingly, the ALJ's decision became the Commissioner's final decision. *See* 20 C.F.R. § 422.210(a). Howard has initiated the instant action for judicial review of the Commissioner's final decision pursuant to 42 U.S.C. section 405(g).

Howard was born on August 23, 1977, and was 32 years old on the alleged disability onset date of February 1, 2010. (Tr. 19, 228.) He completed high school and specialized job training to obtain a commercial driver's license ("CDL"). (Tr. 255.) His past relevant work includes employment as a truck driver, material

handler, buffing machine operator, mixing machine operator, grounds keeper, and wire harness assembler. (Tr. 29.) The medical evidence has been set forth in detail in both the ALJ's decision, Howard's opening brief, and the statement of the case provided in support of the Commissioner. There is no reason to repeat it all in detail here, although pertinent details are discussed below as needed.[1]

DISCUSSION

Review of Commissioner's Decision

This Court has authority to review the Commissioner's decision to deny social security benefits. 42 U.S.C. § 405(g). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." *Id.* Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (citation omitted). In determining whether substantial evidence exists, the Court shall examine the record in its entirety, but shall not substitute its own opinion for the ALJ's by reconsidering the facts or reweighing the evidence. *See Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003).

_____

[1] The Court has borrowed liberally from the parties' briefs.

While a decision denying benefits need not address every piece of evidence, the ALJ must provide a "logical bridge" between the evidence and his conclusion that the claimant is not disabled. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

As a threshold matter, for a claimant to be eligible for DIB or SSI benefits under the Social Security Act, the claimant must establish that he is disabled. 42 U.S.C. §§ 423(d)(1)(A) and 1382(a)(1). To qualify as being disabled, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant has satisfied this statutory definition, the ALJ performs a five-step evaluation:

Step 1:   Is the claimant performing substantially gainful activity? If yes, the claim is disallowed; if no, the inquiry proceeds to Step 2.

Step 2:   Is the claimant's impairment or combination of impairments "severe" and expected to last at least twelve months? If not, the claim is disallowed; if yes, the inquiry proceeds to Step 3.

Step 3:   Does the claimant have an impairment or combination of impairments that meets or equals the severity of an impairment in the SSA's Listing of Impairments, as described in 20 C.F.R. § 404, Subpt. P, App. 1? If yes,

> then claimant is automatically disabled; if
> not, then the inquiry proceeds to Step 4.

Step 4: Is the claimant able to perform his past
relevant work? If yes, the claim is denied;
if no, the inquiry proceeds to Step 5, where
the burden of proof shifts to the
Commissioner.

Step 5: Is the claimant able to perform any other work
within his residual functional capacity in the
national economy? If yes, the claim is
denied; if no, the claimant is disabled.

*See* 20 C.F.R. §§ 404.1520(a)(4)(i)-(v) and 416.920 (a)(4)(i)-(v);

*see also Herron v. Shalala*, 19 F.3d 329, 333 n.8 (7th Cir. 1994).

In this case, the ALJ found that Howard had not engaged in

substantial gainful activity since February 1, 2010, his alleged

onset date. (Tr. 21.) The ALJ found that Howard suffered from

the following severe impairments: diabetes mellitus, hypertension,

obesity, syncopal episodes or seizures of unknown etiology, and

headaches. (*Id.*) However, the ALJ found that Howard did not have

an impairment or combination of impairments that meets or medically

equals the severity of one of the listed impairments in 20 C.F.R.

Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d),

404.1525, 404.1526, 416.920(d), 416.925 and 416.926). (Tr. 22.)

The ALJ made the following Residual Functional Capacity

("RFC") determination:

> [T]he claimant has the [RFC] to perform medium work as
> defined in 20 CFR 404.1567(c) and 416.967(c) except: the
> claimant can never climb ladders, ropes, or scaffolds;
> the claimant can occasionally climb ramps and stairs,
> and balance, stoop, kneel, crouch, and crawl; the
> claimant must avoid even moderate exposure to hazards

such as dangerous machinery and unprotected heights; and, the claimant must avoid concentrated exposure to extreme heat and extreme cold.

(Tr. 23.) Based upon Howard's RFC, the ALJ found that Howard is able to perform his past relevant work as a wire harness assembler and buffing machine operator as they are generally and normally performed in the national economy. (Tr. 29-30.)

Howard believes that the ALJ committed several errors requiring reversal when she failed to properly apply the law regarding the listing of impairments, failed to properly apply the evidence to her conclusions, improperly weighed evidence and made her own medical decisions, did not include all necessary restrictions or impairments when assessing the claimant's RFC, and did not support her decision with substantial evidence.

Relevant Medical Evidence and Facts

_Dr. Thomas Browne_

The record indicates that Howard initially saw Dr. Thomas Browne in January of 2009 after injuring his knee during a fall off the back of a semi-trailer. (Tr. 416.) Treatment options were limited because Howard had no health insurance, but during an April visit Dr. Browne prescribed Keflex and Vicodin. (Tr. 415.) In September of 2009, Howard fell off the back of a semi-trailer again and this time injured his shoulder; Dr. Browne referred him to an orthopedic specialist but recommended that he return to work

the following week.  (Tr. 413-14.)  In December of 2009, Howard presented to Dr. Browne for chest pain, dizziness, trouble breathing, and a cough.  (Tr. 412.)  In February of 2010, Howard returned to Dr. Browne complaining of episodic dizziness for the previous two months, and Dr. Browne referred him to Dr. Martin J. Murphy for evaluation of the dizziness issue.  (Tr. 411.)  Later that month, Howard returned to Dr. Browne after passing out at home.  (Tr. 410.)  Dr. Browne instructed Howard to go to the emergency room, but Howard did not feel he could afford it because he did not have health insurance.  (*Id.*)  On March 15 2010, Dr. Browne diagnosed Howard with syncope, hypertension, and diabetes.  (Tr. 409.)  The treatment notes indicate that Howard had had "several episodes of syncope" but was unable to be evaluated at that time due to his lack of insurance; however, once Howard was approved for Medicaid, he made it clear that he desired to be evaluated and treated, and Dr. Browne referred him to Dr. Abul W. Basher.  (*Id.*)

Howard returned to Dr. Browne on July 19 2010, for a check-up, and Dr. Browne noted that Howard had been suffering from recurrent syncopal episodes and had been advised by cardiology that, due to those episodes, he could not work.  (Tr. 404.)  Dr. Browne issued a note that same day indicating Howard "has recurrent syncopal episodes" and is "unable to work at this time per cardiologist.  I concur with them."  (Tr. 401.)

*Dr. Abul W. Basher*

In March of 2010, per Dr. Browne's referral, Howard presented to Dr. Abul W. Basher, a board certified cardiologist, with complaints of recurrent syncope (at least twice per week) for the previous two months and dizzy spells for the previous six months. (Tr. 445.) Dr. Basher suspected neurocardiogenic syncope and ordered a tilt table test. (*Id.*) On March 17, 2010, Howard underwent a tilt table test at LaPorte Regional Health System, and the result was negative for neurocardiogenic syncope; however, Howard did have "symptoms suggestive of Vertigo when the tilt table was brought to the upright position. He also remained tachycardic . . . during most of the tilting." (Tr. 422-23.) Dr. Basher interpreted the test results and concluded that, although the tilt table test was negative, Howard was experiencing recurrent syncope; Dr. Basher prescribed Toprol and referred Howard to Dr. Mark A. Dixon, an electrophysiologist, for further evaluation.[2] (Tr. 434.) A few months later at one of Howard's follow-up appointments, Dr. Basher opined, "I still personally think this is neurocardiogenic syncope. However, I would like to get another opinion from an Electrophysiologist in Indianapolis." (Tr. 430.) In July of 2010, Dr. Basher noted that Howard continued to

---

[2] Dr. Basher also recommended that Howard start Lifewatch, a continuous cardiac monitoring system, but Howard reported that his cell phone did not properly charge so that monitoring was not undertaken. (Tr. 434.)

experience episodes of syncope as well as numbness of the left foot and headaches. (Tr. 427.) He explained that Howard was not able to get cardiac monitoring done due to coverage issues, and he referred Howard back to Dr. Dixon for possible loop recorder placement. (*Id.*)

### *Dr. Mark A. Dixon*

Dr. Dixon, the Medical Director of Electrophyslology Services at the LaPorte Regional Health System, began seeing Howard in April of 2010 at the request of Dr. Basher for syncope of undetermined origin. (Tr. 463.) At that time, Howard reported having episodes of syncope at least twice weekly. (Tr. 464.) A new transtelephonic monitor was ordered after Howard's first office visit, but the device reportedly did not work, and he was advised to return it. (*Id.*) Dr. Dixon did not actively participate in Howard's care again until July of 2010, when his office received a call regarding Howard's request to have a loop recorder implanted. (*Id.*) On August 4, 2010, Dr. Dixon performed a successful loop recorder implantation procedure. (Tr. 394-96.) Howard was seen by Dr. Dixon on August 13, 2010, for a wound check, and he was instructed to call the office if he experienced a syncopal episode so that the loop recorder could be evaluated. (Tr. 464.) In a letter sent to Howard's attorney dated October 4, 2010, Dr. Dixon noted that he had "received no notice of any

further syncopal episodes." (*Id.*) Dr. Dixon requested that Howard's other physicians make a confirmation of disability since he had received no further notice of additional syncopal episodes. (*Id.*)

Approximately one month later, Howard saw Dr. Dixon again after Howard had reported that he had passed out the day before and that it was "happening more often." (Tr. 462.) Dr. Dixon noted that the loop recorder had shown no arrhythmic etiology, but he suspected a type of vasodepressor disorder and referred Howard to a syncope center for further evaluation and testing. (*Id.*) Dr. Dixon stated, "[i]n light of recurrent syncopal episodes with no diagnosis, the patient should not drive [or] operate machinery." (*Id.*) On November 22, 2010, Dr. Dixon drafted a letter to Howard's attorney indicating that it was his "opinion that in light of recurrent syncopal episodes with no diagnosis, the patient should not drive or operate machinery until a definitive diagnosis can be made. Until that diagnosis can be made, a return to his current line of work should not occur." (Tr. 463.)

Dr. Dixon examined Howard on March 15, 2011. (Tr. 461.) Howard reported dizziness, syncope, and seizures almost daily, and Dr. Dixon's impressions were that Howard suffered from "(1) vasovagal syncope (most likely), (2) no arrhythmias, (3) 'seizure disorder,' (4) peripheral neuropathy, [and] (5) chronic back pain." (Tr. 461.) Dr. Dixon indicated that he concurred with Dr.

Kundi in that the syncope was not arrhythmic but could still be vasovagal. (*Id.*)

### *Dr. Samiullah K. Kundi*

In November of 2010, per a referral from Dr. Browne, Howard began seeing Dr. Samiullah K. Kundi, a neurologist with Indiana Neurology Specialty Care, for evaluation of his syncopal episodes. (Tr. 500.) Howard reported to Dr. Kundi that he had been experiencing the episodes for the past year and that the current frequency of the episodes was about two to three times a day. (*Id.*) He described the episodes to Dr. Kundi as "starting with light-headedness, sweating with some vertigo and then loss of consciousness; lasting from 20 seconds to 1 minute." (*Id.*) He reported having "post-episode confusion and exhaustion for about 2 hours." (*Id.*) Howard also reported having headaches for the past sixteen years following a car accident in which he lost consciousness. (*Id.*) After an examination with mainly normal findings, Dr. Kundi's impressions were that Howard's episodes appeared to be consistent with syncope. (Tr. 502.) He noted that there was a "possibility of superimposed posttraumatic complex partial seizures" considering the "post-episode confusion and exhaustion as well as reported history of suffering during the episodes." (*Id.*) Dr. Kundi ordered an MRI, a CT, an EEG, and

considered EMG/nerve conduction studies depending on the results of the other testing. (*Id.*)

During a January 2011 follow-up visit, Howard reported continued passing out episodes almost daily (with a frequency of up to three times a day) and daily headaches; Dr. Kundi remarked that Howard had not been able to have an MRI done due to the loop recorder, but he noted that both the EEG and the CT were unremarkable. (Tr. 497-99.) The report was roughly the same in February, and Dr. Kundi's impression after considering the testing done to date was that "[t]he spectrum appears to be more consistent with neurocardiogenic syncope" with a "possibility of posttraumatic complex partial seizures." (Tr. 494-96.) He scheduled Howard for EMG/nerve conduction studies and recommended getting a second opinion from an electrophysiologist in Indianapolis. (Tr. 496.) In March of 2011, Dr. Kundi interpreted the results of the electrodiagnostic nerve conduction study as being "consistent with sensorimotor peripheral neuropathy, moderate in intensity and axonal in etiology." (Tr. 485.) He noted that there was "no electrodiagnostic evidence of lumbosacral radiculopathy or compression peroneal neuropathy" and that "[c]linical correlation [was] required." (*Id.*) In April and May of 2011, Dr. Kundi noted that Howard's workup thus far had been unremarkable; however, he indicated that, based on Howard's daily episodes of passing out, the "possibility of convulsive syncope

12

[could not] be excluded" nor could the "possibility of superimposed diabetic autonomic neuropathy . . . with resultant syncope." (Tr. 488-93.)

In addition to the office visits with Howard, Dr. Kundi filled out a Seizure Residual Functional Capacity Questionnaire dated January 25, 2011. (Tr. 478-82.) In it, Dr. Kundi diagnosed Howard with syncope, chronic daily headaches, and suspected seizures. (Tr. 478.) Dr. Kundi opined that Howard's seizures were likely to disrupt his co-workers and that he would need more supervision at work than an unimpaired worker. (Tr. 480.) He also opined that Howard could not work at heights, work with power machines, operate a motor vehicle, or take a bus alone. (*Id*.) Finally, Dr. Kundi noted that Howard would need to take unscheduled breaks of a variable nature during an eight hour work day, would likely be absent from work more than four days a month, and was incapable of even "low stress" jobs. (Tr. 481.)

### *Dr. Martin J. Murphy*

In April of 2010, Dr. Martin J. Murphy, a physician board certified in psychiatry, neurology, and electrodiagnostic medicine, evaluated Howard at the request of Dr. Basher. (Tr. 321-22.) He noted that Howard's neurological examination was "not remarkable" and that the history was "most suggestive of episodes

13

of syncope associated with at times valsalva maneuver suggestive of vasovagal episodes." (Tr. 322.)

### *Dr. Mahmoud Yassin Kassab*

In May of 2010, at the request of the state agency, Howard was examined by Dr. Mahmoud Yassin Kassab. (Tr. 329-332.) Howard reported that he began having episodes of syncope in January of 2010 when he "passed out and dropped to the floor for 36 seconds to 1 minute" which was followed by confusion; these episodes happened several times a week. (Tr. 329.) Dr. Kassab's clinical examination results were normal, but he was left with the impression that Howard presented with symptoms of syncope or seizure; Dr. Kassab recommended doing EAG for further assessment, and MRI of the brain, and a psychiatric evaluation. (Tr. 329-30.)

### *Dr. Joelle J. Larsen*

Dr. Joelle J. Larsen performed a consultative psychiatric examination of Howard in May of 2010. (Tr. 333-45.) According to Dr. Larsen, Howard had a coexisting non-mental impairment that required referral to another medical specialty. (Tr. 333.) She noted that Howard alleged only physical impairments, had no social problems, had normal memory and concentration problems with the exception of when he experienced black outs, exhibited no signs of depression or anxiety, and was credible. (Tr. 345.)

*Dr. J.V. Corcoran*

In June of 2010, a state agency reviewing physician, Dr. J.V. Corcoran, evaluated the medical records that were available to him at that time[3] and completed a residual functional capacity assessment of Howard. (Tr. 347-54.) He opined that Howard could occasionally lift fifty pounds, frequently lift twenty-five pounds, stand/walk for about six hours in an eight hour workday, and sit about six hours in an eight hour workday. (Tr. 348.) The evidence he cited in support of that conclusion included "syncopal episode, non-cardiac or neurologic in origin per TP records." (*Id.*) Dr. Corcoran noted that Howard's symptoms were "partially credible, etiology unknown for syncopal episodes." (Tr. 352.) In July of 2010, Dr. Richard Wenzler, another state agency reviewing physician, evaluated the same evidence and agreed with the prior denial decision, noting that the impairment had "not been shown to have met durational issues." (Tr. 355.)

*Seizure Log*

Howard's wife, Rhianna, compiled a seizure log for the period of May 2011 through early August of 2011. (Tr. 504-510.) In it,

---

[3]   Howard notes that only exhibits 1F through 3F were available at the time of his report. (DE #17, p. 5.)

she noted the dates and times of Howard's seizures and pass outs.
(*Id.*)

*SSA Hearing Testimony*

At the SSA hearing held on August 4, 2011, Howard testified
that he "pass[ed] out, you know, it might not be every day, but
most of the times it's pretty much every day I have seizures."
(Tr. 46.) He indicated that his wife had to stay with him "pretty
much most of the time." (Tr. 49.) When asked about his seizures,
Howard indicated the following:

> I really can't tell much about it. I usually pass out,
> and then I come after I come to, my whole body it just
> hurts – it's really, you know, real tense and sore. So,
> it takes – sometimes, you know, I can come out of them
> within – when I come to, it only takes about an hour.
> Sometimes it's longer until I can actually start, you
> know, recognizing things.

(Tr. 58.) Howard testified that Dr. Kundi had seen him experience
a seizure when he was in his office. (*Id.*) He also testified
that he had chronic headaches. (Tr. 58-59.)

Rhianna testified that she witnessed Howard's seizures and
described them as follows:

> He gets a glazed look in his eyes before he passes out
> and he's kind of – and he'll just drop to the floor and
> he's out for – I don't know, 20 or 30 seconds. And then
> he starts to come to but he's not there yet. Then he
> starts the tremors –you'll see his hand and fingers will
> start to shake and then he starts to convulse. His whole
> body goes stiff and he'll do that for a few seconds and
> he's done with the seizure and then I have to wake him
> up, which it takes me about sometimes like five minutes

to get him to talk to me, because I'm like shaking him
– wake up, wake up.

(Tr. 72-73.)  When asked to differentiate between the "seizures"

and "passing out" as noted on the logs she kept with the help of

her daughter, she stated, "Sometimes he'll just pass out.  If he's

sitting on the couch – I don't know why but he'll just be out for

a few seconds . . . completely, like you just knocked him out. .

. ."  (Tr. 73.)  When asked how long it took him to get back to

normal after such an episode, she indicated that she had to shake

him and stated, "Sometimes hours because he's like – he acts like

he's drunk, he's all – not right.  His speech is slurred at first,

then he's real groggy the rest of the day."  (Tr. 73-74.)


### ALJ's Evaluation of Claimant's Syncope or Seizure Disorder

The ALJ considered listings 11.02 and 11.03[4] and concluded

that Howard's severe impairment, namely syncopal episodes or

---

[4]  (1) 11.02 Epilepsy - convulsive epilepsy, (grand mal or psychomotor),
documented by detailed description of a typical seizure pattern, including
all associated phenomena; occurring more frequently than once a month, in
spite of at least 3 months of prescribed treatment. With:
     A. Daytime episodes (loss of consciousness and convulsive seizures) or
     B. Nocturnal episodes manifesting residuals which interfere
     significantly with activity during the day.

20 C.F.R. Pt. 404, Subpt.P, App. 1, § 11.02.

     (2) 11.03 Epilepsy - nonconvulsive epilepsy (petit mal, psychomotor, or
focal), documented by detailed description of a typical seizure pattern,
including all associated phenomena; occurring more frequently than once
weekly in spite of at least 3 months of prescribed treatment. With alteration
of awareness or loss of consciousness and transient postictal manifestations
of unconventional behavior or significant interference with activity during
the day.

seizures of unknown etiology, does not satisfy listing-level criteria because:

> [t]here is insufficient evidence in the record of the frequency alleged by claimant, and emergency room treatment is generally required for breakthrough seizures. The record shows no medically documented seizures that occurred at listing-level frequency, or even at all. Per testimony, the claimant has more seizures than are medically documented. However, there is no way to confirm this, and the overall credibility of the witnesses at the hearing was not good.

(Tr. 22.) According to Howard, the ALJ erred by improperly evaluating the evidence related to the frequency of the seizures and by making patently wrong credibility determinations.

Howard begins by arguing that the ALJ's decision is flawed because it does not adequately reference any evidence in the record that contradicts the alleged frequency of his seizures. During the hearing, Howard testified that he had seizures "pretty much every day." He indicated that he usually passes out, and when he comes to he is sore and has trouble recognizing things for a period of time afterwards. Rhianna testified consistently, stating that that she had witnessed many of his seizures; she described them in detail including tremors, shaking, convulsing, and stiffness along with slurred speech and grogginess afterwards. The seizure log, compiled by Rhianna and their daughter, records the times and dates of Howard's seizures and/or "pass outs" throughout the months of

---

20 C.F.R. Pt. 404, Subpt.P, App. 1, § 11.03.

May, June, and July of 2011. There are twenty-five recorded seizures and/or pass outs recorded in May, twenty-three in June, and fourteen in July. The log for August of 2011 is only partially completed but records two seizures and/or pass outs within the first three days of the month.[5]

The medical documents regarding the frequency of Howard's seizures indicate that he reported seizures to his physicians beginning in February of 2010 with worsening frequency to and through May of 2011. For example, Howard reported an episode of passing out at home to Dr. Browne in February of 2010, several episodes of syncope in March of 2010, and recurrent syncopal episodes in July of 2010. When Howard first began seeing Dr. Basher in March of 2010, he reported weekly episodes of syncope and continued syncope throughout July of 2010. During his first visit with Dr. Dixon in April of 2010, Howard reported twice weekly episodes of syncope, and during November of 2010, he reported that it was "happening more often." In March of 2011, he reported dizziness, syncope, and seizures almost daily. As to Dr. Kundi, Howard reported daily syncopal episodes during his first visit in

---

[5] While the Commissioner argues that the seizure log is only Howard's "subjective, uncorroborated allegations," the Court agrees with Howard that the seizure log is not subjective; rather, it is other objective evidence compiled by a third party witness to those seizures that was then further elaborated upon by Rhianna during the hearing. See 20 C.F.R. § 404.1528(b); 20 C.F.R. § 404.1529(a); see also 20 C.F.R. Pt. 404, Subpt.P, App. 1, § 11.00 ("Testimony of persons other than the claimant is essential for description of type and frequency of seizures if professional observation is not available.").

November of 2010 and throughout January, February, March, April and May of 2011.

Although the ALJ found that Howard's syncopal episodes or seizures of unknown etiology were a severe impairment, she concluded there was insufficient evidence in the record with regard to the frequency of those seizures to satisfy listing-level criteria. She took specific issue with the fact that there was no emergency room treatment, no medically documented seizures, and that no one but Howard's family members had witnessed a syncopal episode. However, as Howard points out, there is no requirement that medical sources must witness seizure activity for listing frequency to be established, and a lack of emergency room visits does not necessarily correlate to frequency. See *Boiles v. Barnhart*, 395 F.3d 421, 425-26 (7th Cir. 2005).

Similarly, although the Commissioner argues that "not one diagnostic study has confirmed that [Howard] is truly having seizures," it is the frequency of those seizures that is at issue, not their existence. The ALJ did note that diagnostic tests such as the tilt table test, EEG, EKG, and loop recorder cardiac monitor revealed negative or unremarkable findings; yet, she failed to adequately explain why those findings were *inconsistent* with the alleged frequency of Howard's reported seizures. This is especially problematic given the fact that Howard's treating physicians continued to diagnose Howard with syncope even after

the results of those tests were known.[6]  See e.g. *Boiles*, 395 F.3d

at 425 (remanding, in part, because the ALJ did not explain the

relevance of the lack of EEG evidence for his finding that the

seizures were not severe enough to equal a listing).  If the ALJ

believed the frequency of Howard's seizures was unclear or in

question, she was required to solicit additional evidence on the

issue.  *Boiles*, 395 F.3d at 426 (citing *Smith v. Apfel*, 231 F.3d

433, 437-38 (7th Cir. 2000)).  When a medical opinion is not

inconsistent with past treatment, an ALJ can rectify the problem

by gathering more information to flesh out that opinion.  *Barnett*

*v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004) ("Thus, the ALJ

should have contacted [the doctor] for clarification of her medical

opinions, asking for more detail regarding the frequency of [the

---

[6]  For example, in July of 2010 Dr. Browne indicated that Howard had
"recurrent syncopal episodes" and was "unable to work at this time."  Despite
the negative tilt table tests in March of 2010, Dr. Basher diagnosed Howard
with recurrent syncope, and several months later he indicated that he still
personally believed that Howard had neurocardiogenic syncope.  In November of
2010, Dr. Dixon noted that the loop recorder had shown no arrhythmic etiology
but indicated that he suspected a type of vasodepressor disorder; later that
month he drafted a letter to Howard's attorney stating that in light of
Howard's recurrent syncopal episodes with no diagnosis, Howard should not
drive, operate machinery, or return to work until a definitive diagnosis
could be made.  In March of 2011, Dr. Dixon's impressions were that Howard
most likely suffered from vasovagal syncope, and he stated that he concurred
with Dr. Kundi that the syncope was not arrhythmic but could still be
vasovagal.  In November of 2010, Dr. Kundi's impression after an examination
with mainly normal findings was that Howard's episodes were consistent with
syncope.  After he ordered and evaluated further testing, Dr. Kundi opined in
February of 2011 that, considering the testing that had been done to date,
the "spectrum appear[ed] to be more consistent with neurocardiogenic syncope"
with a "possibility of posttraumatic complex partial seizures."  In April and
May of 2011, after further testing and evaluation, Dr. Kundi noted that the
"possibility of convulsive syncope [could not] be excluded" not could the
possibility of superimposed diabetic autonomic neuropathy . . . with
resultant syncope."

claimant's] seizures or for updated medical records that supported
[the doctor's] opinion that [the claimant] was disabled."). Here,
the ALJ simply stated that she gave little weight to the treating
source opinions from Howard's physicians because they were
"apparently based primarily on [Howard's] subjective reports that
are themselves not fully credible, because no diagnosis for [his]
syncope has been established." She neither gathered additional
information nor asked for clarification, and the result is that
she failed to determine how many seizures she believed Howard was
actually experiencing. See *Boiles*, 395 F.3d at 427 (remanding for
further proceedings, in part, because the ALJ made no finding about
the frequency of the claimant's seizures and noting that the record
had to be more developed on that point).

Furthermore, while Howard's wife, Rhianna, provided a seizure
log and testified in detail as to the manner and frequency of the
seizures she and her daughter personally witnessed, the ALJ
discounted Rhianna's testimony because the "overall credibility of
the witnesses at the hearing was not good." In doing so, the ALJ
failed to elaborate on Rhianna's lack of credibility other than to
note that her descriptions of the seizures seemed generic, that
she did not explain why Howard had never required emergency room
care, and that she did not seem to be alarmed by the frequency of
the seizures. Putting aside the issue of emergency room care (as

it is not required),[7] the Court finds that the ALJ's stated reasons given to discredit Rhianna's testimony are based on a narrow view of the record and are patently wrong.  Although the ALJ classified Rhianna's descriptions as "generic," the record reflects that she testified in detailed (albeit not medically sophisticated) terms with regard to the physical and mental effects both during and after Howard's episodes.  The fact that Rhianna "did not seem to be alarmed" by the daily seizures is not an indication that she was necessarily lying about their frequency; rather, it is consistent with the fact that the seizures had become a matter of routine in the Howard household.  Finally, to the extent that the ALJ discounted Rhianna's testimony simply because it tracked Howard's own testimony, that credibility determination is patently wrong as well.  See *Barnett*, 381 F.3d at 670.  While the ALJ stated she believed the credibility of Howard and Rhianna was "not good" regarding the frequency of the seizures, she never "affirmatively determined" the number of seizures she believed Howard experienced so it is not clear whether Howard's impairment meets or equals the listing despite the alleged lack of credibility.  *Id*.

Ultimately, "[a]lthough a claimant has the burden to prove disability, the ALJ has a duty to develop a full and fair record. Failure to fulfill this obligation is 'good cause' to remand for

---

[7]  See *Boiles*, 395 F.3d at 425-26.

gathering of additional evidence." *Smith*, 231 F.3d at 437

(internal citation omitted).[8]


## Howard's Remaining Arguments

Having found remand necessary because the ALJ did not

adequately support her decision that Howard's condition was not

equal in severity to a listed impairment, the Court finds no

compelling reason to address Howard's remaining arguments in

detail.    The Court makes no findings regarding the merits of

---

[8] The Court notes that on June 10, 2016, Howard filed a motion to supplement his reply brief with additional information regarding the actions of the SSA in a subsequent application made by Howard. (DE #25.)  The government did not file a response to the motion to supplement.  On September 27, 2016, this Court granted the motion to supplement, stating that it would consider the information as a supplement to Howard's reply, but took no position as to the ultimate result of that consideration on the pending review. (DE #26.)  As pointed out by Howard, there is a circuit split in how district courts are directed to treat a subsequent finding of disability by the SSA.  In *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 652-53 (6th Cir. 2009), the Sixth Circuit Court of Appeals held that a subsequent favorable decision finding a claimant disabled the day after the initial decision denying benefits did not warrant a sentence six remand because the decision itself standing alone, as opposed to the submission of new and material substantive evidence, could not be used to change the outcome of the prior proceeding.  On the other hand, in a similar situation, the Ninth Circuit Court of Appeals held that because of the "'reasonable possibility' that the subsequent grant of benefits was based on new evidence not considered by the ALJ as part of the first application," remand pursuant to sentence six was appropriate for further consideration of the factual issues based on the existence of the later favorable decision. *Luna v. Astrue*, 623 F.3d 1032, 1034-35 (9th Cir. 2010).  Most recently, the Eleventh Circuit Court of Appeals addressed the situation and sided with the Sixth Circuit, noting that "[a] decision is not evidence any more than evidence is a decision."  *Hunter v. Soc. Sec. Admin. Comm'r*, 808 F.3d 818, 822 (11th Cir. 2015) ("the mere existence of a later favorable decision by one ALJ does not undermine the validity of another ALJ's earlier unfavorable decision or the factfindings upon which it was premised").  This Court agrees with the Sixth and Eleventh Circuits and finds that, in this case, Howard did not meet his burden of showing that remand is proper pursuant to sentence six based on the mere existence of the subsequent favorable decision.  See *Allen*, 561 F.3d at 653.  However, the Court takes no position on any possible substantive evidence that may be presented upon remand consistent with the rest of this opinion.

Howard's claims.  On remand, the ALJ should consider all of the evidence in the record, and, if necessary, give the parties the opportunity to expand the record so that the ALJ may build a logical bridge between the evidence and her conclusions.

CONCLUSION

For the reasons set forth above, the decision of the Commissioner is **REVERSED** and this case is **REMANDED** to the Social Security Administration for further proceedings consistent with this opinion pursuant to sentence four of 42 U.S.C. section 405(g).


DATED:  January 23, 2017                /s/RUDY LOZANO, Judge
                                        United States District Court